# MARY ANN W. ELLICOTT

*v.*

# JOHN M. CHAMBERLIN et al.

A testator's daughter and only child had been given a life interest in a part of her father's estate, by his will. In order to displace the executors, and to obtain the control of the estate herself, with a view to annulling the trusts as far as possible to her own advantage, she made a verbal agreement with one of the executors (Chamberlin), in 1872, to pay him $10,000 to renounce his office, which he did accordingly, and she paid him, at different times, $7,500. He died in 1879, and his executors brought an action at law against her to recover the $2,500, represented by her note. The other remaining executor also renounced in 1872, and she was at once appointed administratrix with the will annexed, and Chamberlin became her surety in $80,000.—*Held*, that complainant is not entitled to restrain Chamberlin's executors from collecting the $2,500 at law, nor to relief as to the $7,500 previously paid.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. E. P. Conklin* and *Mr. J. G. Shipman*, for complainant.

*Mr. J. N. Voorhees*, for defendants.

THE CHANCELLOR.

The complainant, in the fall of 1872, made an agreement with Amphlius B. Chamberlin, now deceased, to pay him

NOTE.—*Query*, as to the validity of this agreement. In *Staunton* v. *Parker*, *19 Hun 55*, an agreement by one who had been named as an executor in a will, made prior to testator's death and contrary to his expressed wishes, by which for a valuable consideration, he agreed to renounce the office, was held to be void as against public policy.—REP.

$10,000 in consideration of his renouncing the executorship of the will of her father, Elisha Warford, deceased, which was then in litigation in the Hunterdon orphans court on a *caveat* filed by her. The testator lived and died in that county. The executors were Mr. Chamberlin and Holcombe Warford, a nephew of the testator, who lived in the same house with the complainant and testator at the time of the death of the latter, and who, at the time of the above-mentioned agreement (to which he was not a party), still resided in Hunterdon county. The testator died May 16th, 1872. The will was made November 11th, 1862, and the codicil February 4th, 1868. The *caveat* was filed on the 28th of May, 1872. On the 6th of July following, the complainant was appointed administratrix *pendente lite*, and gave bond accordingly, pursuant to the requirement of the court, in the sum of $80,000. The application for the grant of that administration was made by her. She stated in her petition that the testator died possessed of personal estate in this state worth, according to the best information she could obtain, between $80,000 and $90,000. The personal estate was appraised, however, in her inventory as administratrix *pendente lite*, at $42,739.62. The testator's real estate in this state was worth, according to the bill, at the time of his death, $40,000. By the will, the testator made a provision for his wife (who predeceased him, however); gave various pecuniary legacies; gave his Tennessee lands to his three grandchildren, Rachel, Warford and George W. Ellicott, children of the complainant, who was his only child; gave the farm on which he at the date of the will resided, to Rachel; a farm then occupied by Richard Williamson to Warford, and a farm then occupied by Jacob Lake to George, and after a specific bequest to Holcombe Warford, gave all the residue to the complainant, empowering his executors to sell if she should desire it. By the codicil, he devised to Warford, Rachel and George respectively, for life, with remainder to their children, as follows: To Warford, a farm on which Robert Skinner then resided, and one of his brick houses in Lambertville; to Rachel, a farm on which Richard Williamson then lived, and another of those houses, and to

George, a farm then occupied by Jonathan Eicke, and another of the houses. To the complainant he gave certain personal property, and such one of his houses in Baltimore as she should select, for life, with remainder to her heirs. He then gave two legacies, and directed his executors to sell at public sale at such time and on such terms as they should deem proper for the interests of his estate, and collect all his debts and money, and directed them to convert all his estate not specifically disposed of into money and invest it in city and railroad bonds, and pay the income to the complainant for life, the principal at her decease to go to her heirs. From the time when she became acquainted with the contents of the will and codicil, which was not until after her father's death, the complainant was desirous of obtaining control of the estate. As before stated, she was his only child (she was a widow), and Rachel, Warford and George were her children. Mr. Chamberlin offered the will and codicil for probate May 30th, 1872, but on the same day the complainant filed the *caveat*, and probate was therefore denied for the time, and a litigation over the instruments began. After it commenced, the complainant approached Mr. Chamberlin and sought to induce him to renounce the executorship, but he refused. It appears that Holcombe Warford, the other executor, was willing to do so. if she desired it. In or about October, 1872, a verbal agreement was made between her and Mr. Chamberlin, that in consideration of $10,000, to be paid by her to him, he would renounce, and on receipt of the tax paid by him therefor, convey to her a tax-title he had obtained to some land on which the estate held a mortgage. On the 15th of November, 1872, she paid him $200 on account. One year afterwards she paid him $150, and in March, 1874, she paid him in cash, and by the assignment to him of a bond and mortgage given to her by Peter A. Yawger, and which she held in her own right, $4,611.88, and for the balance gave him her note for $5,000, payable on the 1st of April, 1875, with interest from April 1st, 1874. On that note she paid $2,500 of principal, and made a payment of interest. Mr. Chamberlin died in May, 1879. In August following, his executors brought a suit against the complainant in

the Hunterdon circuit court to recover the balance due on the note. On the 18th of December following the bill was filed.

Its object is not only to stay that suit and obtain a decree for the return of the note, but to compel the repayment to the complainant of the money paid on account of the $10,000, and the assignment to her of a bond and mortgage which Mr. Chamberlin took from Yawger in place of those which she assigned to him as part payment of the $10,000.

The ground for relief stated in the bill is what is there claimed to be duress, the circumstances of which are said to be that Mr. Chamberlin claimed and insisted that the executors would, by virtue of the codicil, have the entire control and disposition of the estate, and that the complainant believed that he had exercised undue influence over the testator to induce him to make the codicil, and that she feared and believed that he would take advantage of the power over the property which the codicil gave to the executors, and sell the real estate for cash and have it bid off for him by some friend of his at much less than its actual value, and that he threatened that he could and would make and realize as gain for himself from the estate the sum of $25,000, knowing, at the same time, that his legal fees and commissions would not amount to that, but to a much smaller sum, and that she believed and feared that the estate would be squandered and lost, and disposed of in such a way as that he would make great gains therefrom, and she and her children, on the other hand, be impoverished thereby. She claims, by the bill, that what she has paid on account of the agreement has been paid out of the money of the estate, and states that if she be compelled to pay the money due on the note it will be paid out of the same funds.

The proof shows that, as before stated, from the beginning the complainant was anxious to get control of the estate herself, and she approached Mr. Chamberlin on the subject, with a request that he would renounce. He refused to do so unless she would pay him a satisfactory compensation therefor. Her testimony as to the statements of Mr. Chamberlin and her transactions with him, are not competent evidence. *P. L. of 1880 p. 52.* Her son Benjamin (Warford) testifies that she asked Mr. Chamberlin

whether he had any interest in the estate further than his lawful fees and commissions in settling it, and he replied that he could make $20,000 in settling it, and selling the different pieces of property and investing the money, as directed in the codicil, and he would do it; and that she then asked him if he could make that amount by settling the estate honestly, and he says he does not think Mr. Chamberlin answered that question. He says. Mr. Chamberlin asked $20,000 as consideration for renouncing. Benjamin further says that subsequently Mr. Chamberlin, on her refusing to give $20,000, offered to take $18,000, and then $15,000, then $12,000, and finally $10,000, which she agreed to give. There is no evidence of any threats on Mr. Chamberlin's part, nor even of any pressure to obtain the agreement, but it is quite apparent that he took advantage of her great anxiety to get control of the estate to obtain a price for his renunciation, which he well knew was exorbitant, and to that end made statements to her as to what he could make for himself by the executorship, which were gross exaggerations, and excited her apprehensions of fraud on his part, if he should be permitted to execute the will. But, on the other hand, she was administratrix *pendente lite* and knew what the probable amount of the estate was, and had abundant opportunity to obtain information on the whole subject. She filed her inventory as administratrix *pendente lite,* on the 3d of October, 1872, and, of course, knew what the personal estate was appraised at then. She was, by no means, *inops consilii.* On the contrary, she had the means of obtaining the best legal advice. She was represented by four eminent lawyers in the contest over the will and codicil, and she informed one of them of the agreement before she paid anything whatever on account of it.

It was by no means difficult for her to ascertain what the executorship would be fairly worth to Mr. Chamberlin, and what powers were conferred on the executors by the codicil. The business was not done in any haste. She appears to have made application to Mr. Chamberlin and not he to her. The agreement was never reduced to writing. To say nothing of the time occupied in the negotiations, a whole year elapsed after the first

payment, on account of it (which was but $200), until the next was made (which was only $150), and then four months elapsed before the next payment.   Though the evidence on her side is that it was no part of the bargain that he should do so, Mr. Chamberlin became surety for her on her bond in the penalty of $80,000, given as administratrix *cum testamento annexo*.   The other sureties were her daughter and one of her sons.   There appears to have been no unkind feeling on her part towards Mr. Chamberlin on account of the bargain.   It was not only voluntarily made by her but it was of her own seeking.   The sum demanded was very excessive, and so was the sum obtained.   Mr. Chamberlin's son, who was present at and took part in the negotiation, says he never heard his father ask a larger sum than $15,000, and from Benjamin W. Ellicott's testimony it would seem that the highest sum he heard Mr. Chamberlin ask was $20,000.   According to Mr Nixon's testimony he at first demanded $25,000.   But whatever may have been the highest sum, the sum he obtained was greatly in excess of what he could fairly claim.   But for all that I do not think the complainant is entitled to relief in this court.   I am satisfied from the evidence that her object was to displace the trustees whom the testator had appointed, and to whom he had committed the management of his estate, not so much from apprehension of fraudulent management on the part of Mr. Chamberlin as to obtain the control of the estate herself, with a view to annulling the trusts as far as possible to her own advantage.   It appears that as administratrix with the will annexed, she sold the real estate, valued at $40,000, to her son for about $6,200, and received a conveyance of it from him to herself.   Though the sale was public yet it was so conducted as to favor and effectuate a purpose on her part (if such she had) to acquire ownership of the property sold, and so change her life estate in it to an absolute title, in fee.   It is also clear that it was part of the understanding between her and Mr. Chamberlin that she should obtain the renunciation of the other executor as she readily could and did, and that letters of administration with the will annexed should be issued to her, and that Mr. Chamberlin would be her surety.   Her counsel, to

whom, as before stated, she communicated the bargain before she had made any payment upon it, strongly advised her against it, and denounced the conduct of Mr. Chamberlin in demanding so large a sum as $10,000, but she nevertheless was determined to carry out the agreement. She made the bargain on her own account, and if she paid the money out of the funds of the estate she had no right to do so. The Yawger mortgage was her own property and it does not appear that she paid any money of the estate on account of the agreement. She brings this suit in her own name. She appears to have made no objection to Mr. Chamberlin's demand upon her under the agreement in his lifetime, and never did so until after he was dead and suit was brought against her by his executors. It was over seven years from the time when the agreement was made to the time when this suit was brought. Under the circumstances, she is entitled to no aid from this court, either by compelling repayment of what she has already paid, or by restraining the defendants from collecting the balance due on the note. The bill will be dismissed, but without costs.